UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,        )
for the use and benefit of       )
AUBURN DOOR & HARDWARE, LLC,     )
and AUBURN DOOR & HARDWARE,      )
LLC,                             )
                                 )
              Plaintiffs,        )    CIVIL ACTION NO.
                                 )    10-11074-DPW
                                 )
         v.                      )
                                 )
SUFFOLK CONSTRUCTION COMPANY,    )
INC., NORTHEAST INTERIOR         )
SUPPLY, INC., FIDELITY AND       )
DEPOSIT COMPANY OF MARYLAND,     )
and SAFECO INSURANCE COMPANY     )
OF AMERICA,                      )
                                 )
              Defendants.        )

MEMORANDUM AND ORDER
September 19, 2013

     This construction dispute arises out of the renovation and
restoration of the John W. McCormack Post Office and Courthouse
in Boston.  Before me is a motion for summary judgment filed
jointly by Suffolk Construction Company, Inc. ("Suffolk"),
together with Fidelity and Deposit Company of Maryland, and
Safeco Insurance Company of America (collectively, the "Surety
Defendants").

**I. BACKGROUND**

***A.   Factual Background***

     The United States General Services Administration retained

-1-

Suffolk to serve as general contractor for the McCormack renovation project in September 2006.  Pursuant to its obligations under the Miller Act, 40 U.S.C. § 3131, Suffolk obtained and was the principal on a bond issued by the Surety Defendants.

In March 2007, Suffolk engaged Northeast Interior Supply, Inc. ("Northeast") as a subcontractor to supply and install doors and door hardware for the project.  Northeast, in turn, engaged Auburn Door & Hardware, LLC ("Auburn Door") in February 2007 to provide labor for the installation of doors and hardware supplied by Northeast. Auburn Door's base contract with Northeast for its work on the McCormack project was for $420,600.  Over the course of the project, Suffolk directed Northeast and/or Auburn Door to perform additional tasks that developed.  Auburn Door's manager Thomas Black was often in contact with Suffolk's project manager, Ryan Cardoos, to discuss work left to be completed and how much it would cost.  According to Black, when Auburn Door handled work requests directly from Suffolk, it would submit "additional work authorizations" to Northeast and log the approved requests as "change work orders." Auburn Door regularly sent invoices to Northeast, but never addressed or issued any invoices to Suffolk.

Cardoos, for his part, was generally positive about the installation work performed by Auburn Door.  The same could not be said of Northeast, which faced a variety of management and

-2-

financial difficulties.  At various times, Northeast failed or refused to pay Auburn Door, and Auburn Door threatened to stop working on the project due to nonpayment by Northeast.  In response, during the Fall of 2008 and again during May 2009, Suffolk made joint payments to Northeast and Auburn Door.  By July 2009, Auburn Door was requesting from Northeast only enough money to cover its payroll and keep its carpenters on the job.

Auburn Door last performed work on the project in September 2009.  At that point, Black on behalf of Auburn Door sent Northeast a final invoice; taking the total previously billed to Northeast plus all additional work authorizations (which had not previously been invoiced), and subtracting what already had been paid, Black calculated the outstanding balance due to Auburn Door at $664,466.92.

## B.  *Procedural History*

Auburn Door initiated this action on June 24, 2010.  Against Suffolk and the Surety Defendants, it brought a federal claim for violation of the Miller Act, 40 U.S.C. § 3131 *et seq.*(Counts I and II), and Massachusetts state law claims for breach of contract (Count III), breach of implied contract (Count V), unjust enrichment (Count VII), quantum meruit (Count IX), promissory estoppel (Count XI), and unfair and deceptive business practices, Mass. Gen. Laws ch. 93A, § 11 (Counts XIII and XV).

Auburn Door brought the same set of state law claims against Northeast (Counts IV, VI, VIII, X, XII, and XIV).

I consolidated this case with a separate action earlier filed by Northeast against Suffolk and the Surety Defendants, *U.S. for Use of Northeast Interior Supply, Inc.* v. *Suffolk Construction Company, Inc.*, No. 10-10531 (D. Mass. filed Mar. 30, 2010; stayed Nov. 29, 2012), but that matter was stayed when Northeast initiated bankruptcy proceedings in late November 2012. The case settled earlier this spring and a stipulation of dismissal has been entered dismissing claims in that case and asserted counterclaims involving Northeast in this case.

Before me in this case is the motion for summary judgment filed by Suffolk and the Surety Defendants.

## II. STANDARD OF REVIEW

Fed. R. Civ. P. 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986). The question is whether, viewing the facts in the light most favorable to the nonmoving party, there is a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a); *Casas Office Machines, Inc.* v. *Mita Copystar Am., Inc.*, 42 F.3d 668, 684 (1st Cir. 1994).

### III. ANALYSIS

**A.  *Miller Act (Counts I and II)***

   <u>1.</u>  <u>Merits</u>

The Miller Act requires the principal contractor on a government project to post a payment bond, 40 U.S.C. § 3131, in order to protect suppliers of labor or material.  *See generally F. D. Rich Co., Inc.* v. *U. S. for Use of Indus. Lumber Co., Inc.*, 417 U.S. 116, 122 (1974).  Although suppliers on private construction projects typically can secure a lien against the improved property under state law, such a lien cannot attach to government property.  *Id.*  The Miller Act thus provides an alternative remedy by allowing suppliers to make a claim against the bond.  40 U.S.C. § 3133(b).

The Act, however, requires that a claimant having a contractual relationship with a subcontractor, but lacking a contractual relationship with the principal contractor, to provide the principal contractor with written notice of its claim against the bond "within 90 days from the date on which the person did or performed the last of the labor or furnished or supplied the last of the material for which the claim is made." 40 U.S.C. § 3133(b)(2); *U. S. for Use of John D. Ahern Co., Inc.* v. *J. F. White Contracting Co.*, 649 F.2d 29, 31 (1st Cir. 1981) ("The requirement that notice must be given to the principal contractor within the ninety-day period is mandatory and is a

-5-

strict condition precedent to the existence of any right of action upon the principal contractor's bond."). Auburn Door does not dispute that it failed to provide timely and proper notice of its claim, and thus does not oppose entry of summary judgment on Counts I and II.

### 2. Implications for Jurisdiction

Dismissal of the Miller Act claims, however, brings to the fore questions of subject matter jurisdiction which, although not raised by the parties, I raised *sua sponte* with them during the summary judgment hearing. *Cf. McCulloch* v. *Velez*, 364 F.3d 1, 5 (1st Cir. 2004). Federal jurisdiction in this case was premised entirely on plaintiff's claim under the Miller Act, *see* 28 U.S.C. §§ 1331, 1352; diversity jurisdiction would have been defeated because Auburn Door and Northeast are both citizens of New Hampshire, *see* 28 U.S.C. § 1332. With the dismissal of the claims involving Northeast, there is complete diversity. *Cf. Newman-Green, Inc*. v. *Alonzo-Larrain*, 490 U.S. 826, 833 (1989) ("it is well settled that Rule 21 invests district court with authority to allow a dispensable nondiverse party to be dropped at any time, even after judgment has been rendered.")

In any event, I would continue to exercise supplemental jurisdiction if necessary. *See generally* 28 U.S.C. § 1367. I have overseen this case through discovery and completion of the summary judgment record. Litigating this case at this juncture

-6-

in a state court unfamiliar with the dispute would cause the parties unnecessary delay. *Cf. Roche* v. *John Hancock Mutual Life Ins. Co.*, 81 F.3d 249, 257 (1st Cir. 1996) (affirming exercise of supplemental jurisdiction after granting summary judgment on only federal claim when "litigation had matured well beyond its nascent stages, discovery had closed, the summary judgment record was complete, the federal and state claims were interconnected, and powerful interests in both judicial economy and fairness tugged in favor of retaining jurisdiction"). Moreover, unlike the threshold question of original jurisdiction over the case, the parties may waive objection to my discretionary exercise of supplemental jurisdiction. *See id.* at n.6.  The parties here have done so.

## B.  *Contractual Claims (Counts III, V, and XI)*

Auburn Door concedes that it has no written contract with Suffolk.  It nevertheless brings its claims for breach of contract (Count III), breach of implied contract (Count V), and promissory estoppel (Count XI) on the basis of an oral contract or promise by Suffolk.

The alleged promises, attested to by Black, are as follows. According to Black, the project executive for Suffolk, Michael Cappellano, requested in early 2009 that Auburn Door increase its personnel on the McCormack project and promised that, if it did, "Suffolk guaranteed it would be paid."  Auburn Door says that, as

a result, it increased its manpower and stayed on the job longer than it otherwise would have done.  Additionally, Black affirms that when Cardoos became aware that Auburn Door was having payment problems with Northeast, he promised that "if Northeast was unable to complete the job, Suffolk would take over the contract between Northeast and Auburn Door."  On one occasion in which Cardoos contacted Black directly about performing additional work, he told Black that "we'll work something out obviously" and, after Black assured Cardoos that the work would get done, Cardoos replied "I am sure between the two of us we can work it out"; these representations were recorded by voicemail transcription and email.

As to the alleged oral promises made by Cappellano and Cardoos, Auburn Door correctly observes that "the terms of an oral contract may be established entirely through testimony." *Vasconcellos* v. *Arbella Mut. Ins. Co.*, 853 N.E.2d 571, 574 (Mass. App. Ct. 2006).  However, this does not mean that any allegation of an oral promises raises a genuine issue of fact as to the existence or terms of an oral contract.  "Vague and conclusory statements in an affidavit," for example, "do not meet the specificity requirement of Federal Rule 56." *Posadas de Puerto Rico, Inc.* v. *Radin*, 856 F.2d 399, 401 (1st Cir. 1988).

Black's attestation to Cappellano's alleged promise is just such a "vague and conclusory" statement.  Black fails to provide

any detail as to the nature or context of the conversation.
Beyond identifying the nonspecific timeframe of "early 2009," he
cannot even say when the alleged statement was made.  Moreover,
given the limited context that is clear from the record, Auburn
Door cannot establish a firm promise by Suffolk to pay the
amounts unpaid by Northeast.  Highlighting the ambiguity in
Cappellano's alleged promise, for example, is the fact that
Suffolk at times made joint payments to Northeast and Auburn
Door.  This was one way in which Suffolk helped "guarantee" that
Auburn Door would receive payment despite Northeast's
delinquency, without assuming new contractual obligations to
Auburn Door.

    The statements made by Cardoos have slightly more substance,
but are no more helpful in establishing the existence of an oral
contract.  For example, the alleged representation that "if
Northeast was unable to complete the job, Suffolk would take over
the contract between Northeast and Auburn Door" is conditional.
Not only is it unclear what it might have meant for Northeast to
become "unable to complete the job," but also there is no
evidence of subsequent discussions about whether or when
Northeast became "unable to complete the job."  To the contrary,
Auburn Door sent invoices only to Northeast throughout the
project, providing no indication that the alleged oral contract

existed let alone that the precondition for Suffolk taking over the contract had been met.

The communications between Black and Cardoos display a similar pattern. The alleged statement by Cardoos that he was sure Suffolk and Auburn Door could "work something out" regarding additional work performed is far too "vague and noncommittal" to establish a binding promise or contract. *Normandin* v. *Eastland Partners, Inc.*, 862 N.E.2d 402, 413 (Mass. App. Ct. 2007) (statement that party would "attempt to work something out" with other party was too vague to modify parties' contractual relationship). As with the statements discussed above, these statements do not constitute sufficiently firm or clear promises to constitute a contract between Suffolk and Auburn Door. And again, although Suffolk communicated directly with Auburn Door with respect to certain work, Auburn Door continued to look to Northeast for work authorization and payment.

On this record, then, there is no basis to find that there was an oral contract, contract implied-in-fact, or promise on which Auburn Door reasonably relied, by which Suffolk obligated itself to step into the shoes of Northeast or otherwise pay Auburn Door directly for work performed on the project. Consequently, I will enter summary judgment for defendants on Counts III, V, and XI.

**C.  *Quasi-Contractual Claims (Counts VII and IX)***

   1.  Merits

   A different question is whether Auburn Door is also foreclosed from bringing its quasi-contractual claims for unjust enrichment (Count VII) and quantum meruit (Count IX).  The "underlying basis" for both theories "is unjust enrichment of one party and unjust detriment to the other party."  *Salamon v. Terra*, 477 N.E.2d 1029, 1031 (1985).

   Under a long line of Massachusetts precedent, parties in Auburn Door's position typically would be limited to seeking remedies from Northeast--the only entity with which Auburn Door was in privity of contract.  *See e.g., La Chance* v. *Rigoli*, 91 N.E.2d 204, 205 (Mass. 1950); *Brick Const. Corp.* v. *CEI Dev. Corp.*, 710 N.E.2d 1006, 1008 (Mass. App. Ct. 1999); *Evans* v. *Multicon Const. Corp.*, 574 N.E.2d 395, 401 (Mass. App. Ct. 1991).

   In *Mike Glynn & Co.* v. *Hy-Brasil Restaurants, Inc.*, 914 N.E.2d 103 (Mass. App. Ct. 2009), however, the Massachusetts Appeals Court permitted a subcontractor to recover under quasi-contractual theories of unjust enrichment/quantum merit in circumstances closely analogous to those presented here.  There, the subcontractor was prepared to walk off the job following nonpayment by the general contractor--the only entity with which it had a contractual relationship.  *Id.* at 105.  The subcontractor continued work only after some assurance from the

property owners that they would pay the subcontractor if it completed the job. *Id.* The court refused to find a formal express or implied-in-fact contractual relationship between the subcontractor and the owner; such arguments were undermined, as here, by the vagueness of the promises at issue and by the fact that the subcontractor continued to bill the general contractor for payment. *Id.* at 105-106. But because the subcontractor continued work only after "some motivation from the [owners], who were the direct beneficiaries of the completion of the project," and because the owners must have known the subcontractor expected to be paid by *someone*, the court permitted the subcontractor to recover against the owners under theories of unjust enrichment/quantum meruit. *Id.* at 105, 107-08.

The Appeals Court emphasized that earlier Massachusetts cases specified only that upstream entities "ordinarily" were not liable to subcontractors with which they were not in privity. *Evans*, 574 N.E.2d at 401. The inducement of the owners in *Mike Glynn*, however, distinguished the "ordinary" case. Even if such inducement did not rise to the level of creating a formal contract, the subcontractor reasonably expected payment from the owners after it was induced to stay on the job. *Mike Glynn*, 914 N.E.2d at 108. The court thus concluded that allowing the subcontractor quasi-contractual recovery against the owners for work performed after the inducement was consistent with the

Supreme Judicial Court's oft-quoted admonition that a "contracting party must look for payment to the one to whom credit was extended when the work was done, that is, the one who was expected to pay and who in fact expected to pay or as a reasonable man should have expected to pay." *La Chance*, 91 N.E.2d at 205; *Mike Glynn*, 914 N.E.2d at 108-109.

The result reached by the court in *Mike Glynn* by application of Massachusetts case law I might find is also consistent with recent trends reflected in the *Restatement (Third) of Restitution & Unjust Enrichment* § 25 (2011). Under the Restatement:

> (1) If the claimant renders to a third person a contractual performance for which the claimant does not receive the promised compensation, and the effect of the claimant's uncompensated performance is to confer a benefit on the defendant, the claimant is entitled to restitution from the defendant as necessary to prevent unjust enrichment.
>
> (2) There is unjust enrichment for purposes of subsection (1) only if the following three conditions are met:
>
>> (a) Liability in restitution may not subject the defendant to a forced exchange (§ 2(4)). This condition is likely to be satisfied if the benefit realized by the defendant
>>
>>> (i) is one for which the defendant has expressed a willingness to pay,
>>>
>>> (ii) saves the defendant an otherwise necessary expense, or
>>>
>>> (iii) is realized by the defendant in money.
>>
>> (b) Absent liability in restitution, the claimant will not be compensated for the performance in question, and the defendant will retain the benefit of the claimant's performance free of any liability to pay for it.

> (c) Liability in restitution will not subject the
> defendant to an obligation from which it was understood
> by the parties that the defendant would be free.

*Id. at* § 25.  The Restatement thus reflects the trend that, in

cases involving "a claim against a defendant who stands to retain

the performance for which he contracted, and without paying

anybody for it . . . denial of restitution is today a distinct

rarity."  *Id.* rptrs. note b.

I adopt the reasoning of *Glynn* and the restatement.[1]  Under

the rule laid out in the Third Restatement, and effectively

adopted by *Glynn*, there remain genuine issues of fact as to

Suffolk's liability in restitution to Auburn Door.  Suffolk

clearly benefitted from Auburn Door's work, at least some of

which the record indicates may have been performed only upon

_____

[1] I raised with the parties but now reject the use of
certification to the Supreme Judicial Court to settle any
lingering concerns about the application of *Mike Glynn & Co.* v.
*Hy Brasil Restaurants, Inc.*, 914 N.E.2d 103 (Mass. App. Ct. 2009)
to this case.  *Mike Glynn* indicates, in its own holding and in
its analysis of Massachusetts precedent, that application of
quasi-contractual theories in this context is not novel under
Massachusetts law.  The relevant aspects of the Restatement were
imminent in Massachusetts law, even if the precise contours of
liability were not as crisply articulated.  *Cf. Restatement
(Third) of Restitution & Unjust Enrichment* § 25 rptrs. note b
(observing that cases in most states "carry the reasonable
implication, even if they do not state directly, that the
plaintiff's restitution claim would be viable if the benefits in
question had not been paid for" by the property owner or other
up-the-line party with whom the plaintiff was not in privity).
Thus, because concerns about federal-state comity or unfairness
to the parties are absent, I conclude there is no need to certify
to the SJC the question whether Auburn Door may seek restitution
from Suffolk under theories of unjust enrichment and quantum
meruit in these circumstances.

inducement by Suffolk or following some indication that Suffolk would be willing to pay for the work. *Cf. Mike Glynn*, 914 N.E.2d at 108-09; *Restatement (Third) of Restitution* § 25(2)(a)(i). Whether and to what extent Suffolk has unjustly retained the benefit conferred by Auburn Door may depend on the extent to which Suffolk has already made payment under its contract with Northeast. *Cf. Restatement (Third) of Restitution* § 25(2)(b) & cmt. b. (a "fundamental requirement of unjust enrichment in these circumstances is that [defendant] must stand to obtain a valuable benefit at [plaintiff's] expense without paying anyone for it"). At this stage, however, it suffices to create a genuine issue of fact that Suffolk stopped payments to Northeast at some point, but nevertheless appears to have obtained all the work it desired.

**D.   Chapter 93A (Counts XIII and XV)**

Auburn Door does not oppose summary judgment as to its 93A claims, presumably in recognition that "a good faith dispute as to whether money is owed, or performance of some kind is due, is not the stuff of which a c. 93A claim is made." *Duclersaint* v. *Fed. Nat. Mortg. Ass'n*, 696 N.E.2d 536, 540 (Mass. 1998). Accordingly, I will enter summary judgment on Counts XIII and XV.

**E.   Damages**

In addition to the $664,466.92 in outstanding invoices, Auburn Door seeks "labor impact damages" for reduced productivity

or efficiency attributable to disruptions Suffolk allegedly created at the work site.  Labor impact damages are a form of consequential damages for breach of a construction contract.  *Cf. U.S. For Use & Benefit of Gray-Bar Elec. Co., Inc.* v. *J. H. Copeland & Sons Const., Inc.*, 568 F.2d 1159, 1161 (5th Cir. 1978).  Specifically, Auburn Door argues that its workers spent 15% of their time waiting for elevators because only a few elevators were working on any given day, resulting in damages of $316,934.00.  It also argues that the unavailability of a hoist for 40% of the project caused delay in moving materials, resulting in damages of $90,550.00.  Finally, Auburn Door says that these various disruptions and the direct dealings between Suffolk and Auburn Door required Thomas Black to be on-site more often than he otherwise would have been, resulting in damages of $205,600.00.

The parties dispute whether labor impact damages must be proved by expert testimony, and if so whether I should excuse the untimely and potentially inadequate disclosures of expert witnesses by Auburn Door.  Even if expert testimony is not required, Suffolk argues Auburn Door lacks sufficient evidence to prove its damages in this regard.  I need not enter this thicket because labor impact damages are unavailable to Auburn Door regardless of the adequacy of its proof.

Auburn Door is limited to seeking *restitution* from Suffolk in its remaining claims for unjust enrichment and quantum meruit. While damages are measured by a plaintiff's loss or injury, restitution is measured by a defendant's gain or benefit. 1 Dobbs, *Law of Remedies* § 3.1, at 280; *LaRocca* v. *Borden, Inc.*, 276 F.3d 22, 28 (1st Cir. 2002).  Auburn Door's alleged inefficiency losses are not a measure of Suffolk's gain, and thus are not recoverable under its remaining quasi-contractual claims against Suffolk.

Even measuring Suffolk's potentially unjust gain, however, is no ministerial task for the court at this stage.  Auburn Door will have no claim in restitution if Suffolk "has already paid the contract price for the benefits received, even if the contract price is less than the cost or value of the performance in question."  *Restatement (Third) Restitution & Unjust Enrichment* § 25 cmt. b. illus. 3.  Herein lies the relevance of the dispute, not fully developed by the parties, whether Suffolk's contract with Northeast covered the various "additional" work performed by Northeast and Auburn Door.  If it did, Auburn Door's recovery, if any, will likely be capped at unpaid amounts under Suffolk's original contract with Northeast. To the extent that significant aspects of the project were completed at Suffolk's direction but were not within its original contract with Northeast, Auburn Door is eligible to recover from

-17-

Suffolk "the reasonable value of its labor and materials or the price fixed by

its contract with [Northeast], whichever is less." *Id.* § 25 cmt. b. illus. 2.

In any event, the fact that Auburn Door's potential recovery is largely contingent on the terms of Suffolk's contract with Northeast, and the extent of Suffolk's payment under that contract, only further underscores that resolution of the quasi-contractual claims must begin with examination of Suffolk's payments to Northeast. From there, the parties may seek to discovery any other relevant information to provide a precise damage figure.

## IV. CONCLUSION

For the reasons set forth more fully above, defendant's motion for summary judgment is DENIED as to Counts VII and IX, and GRANTED as to Counts I, II, III, V, XI, XIII and XV. The parties shall submit a joint memorandum on or before September 27, 2013 outlining what further actions will be necessary to bring this case to final judgment. A scheduling conference will be held at 10:00 a.m. on October 2, 2013 in Court 1 to consider further scheduling.

*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

-18-